CLERK, U.S. BANKRUPTCY COURT
DISTRICT OF OREGON

JUL 1 5 2004

LODGED_____REC'D_____
PAID_____DOCKETED_____

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case No. |
| | ) 04-60346-fra7 |
| FIDUCIARY EDUCATIONAL SOCIETY, | ) |
| | ) MEMORANDUM OPINION |
| Debtor. | ) |

In this cautionary tale we learn that there are limits to the Court's equitable authority. For the reasons set out below, the Trustee's motion seeking substantive consolidation with various non-debtor entities must be denied.

I. BACKGROUND

1. <u>The Debtor</u>

Fiduciary Educational Society (FES) is a trust created in 1991 by Rick Prescott and Roy Fritts, acting as trustees of National Trust Services (NTS). While the declaration of trust sets out in detail the trustors' aspirations that the trust advance the tenets of the Bible and the Constitution, it omits such specifics as the identities of the trustees, the specific duties of the trust, or the identity of any beneficiary. As discussed in more detail below, the trust was ultimately funded by NTS and Fountainhead Global Trust

PAGE 1 - MEMORANDUM OPINION

(FGT), which conveyed real property in Josephine County, Oregon, to FES as "fiduciary" for FGT. However, before getting to that point, the narrative should turn to NTS and FGT, the entities the trustee seeks to absorb into this bankruptcy.

2. <u>NTS and FGT</u>

> *Bilgewater, I am the late Dauphin!. . . .Yes, my friend, it is too true – your eyes is lookin' at this very moment on the pore disappeared Dauphin, Looy the 17, Son of Looy the 16 and Marry Antoinette.*
> *- Adventures of Huckleberry Finn,* Chapter XIX

Just as Huck and Jim were introduced to European royalty on the Mississippi, so were investors introduced to the world of personal trusts and high stakes investing by Rick Prescott and Roy Fritts. National Trust Services was created to sell potential investors on the notion of creating complex family trusts to manage their assets. A colorful brochure was created, replete with quotations from the founding fathers, bogus legal citations[1], and glowing, but unattributed, endorsements from the "many thousands already in the NTS trust system." The brochure, in several pages of small type, describes the benefits of "the unique NTS program," including "basic knowledge, skills, training and 'how-to' approaches – along with your custom designed NTS trust document." However, the

---

[1] The pamphlet cites "Crocker v. MacCloy, 649 U.S.Supp. 39 270" as authority for the proposition that "a trust relationship comes under the realm of equity, based upon common law, and is not subject to legislative restrictions as are corporations and other organizations created by legislative authority." The Court has searched in vain for anything resembling the cited case. Of course, there is no "U.S.Supp.."

PAGE 2 - MEMORANDUM OPINION

actual nature of the services, or of the trusts to be created, is not described.

The pamphlet does describe the career of NTS founder Roy Fritts. Mr. Fritts is said to be the recognized world authority on complex trusts, having previously undertaken "a major historical effort for establishing a legal precedence on each and every vital issue of the trust," employing a $24 million budget. He had been, investors are told, contract manager at The World Bank, developer of the entire city of Crystal Springs, Florida, founder of 12 multi-million dollar businesses, Businessman of the Year of the American Management Association, a member of the California Bi-Centennial Commission, and, a man of "impeccable integrity" whose life story demonstrates "his great faith in God and his genuine desire to be a servant to others."[2]

Investors are invited to avail themselves of Mr. Fritts' skills, and those of Mr. Prescott and others, at a two-day workshop. At the workshops, participants are trained in the ways of personal trusts, use of the unique NTS program, and led to take the first steps into the world of trusteeship and investing by creating their own trusts, funded with their own (and, occasionally, other family members') assets. The fee for the instruction, copious materials, counseling and creation of the trust was $9,500.

---

[2] Testimony at the hearing described Mr. Fritts as a disenchanted, if not estranged, heir of the Mellon family. One witness testified that Fritts told him that Fritts' family owned the Philadelphia office of the Internal Revenue Service.

PAGE 3 - MEMORANDUM OPINION

3. Fountainhead Global Trust

At training sessions held in the Cayman Islands, investor/trustees are introduced to Fountainhead Global Trust. FGT was created by a declaration of trust by and between NTS and Messrs. Prescott and Fritts, and one Joe Little, as trustees. The beneficiary is NTS. The purpose of the trust was to serve as NTS's "investment arm", and to invest funds supplied by members of the NTS family of trustees.[3] Over time FGT (if its own numbers are to be believed) collected approximately $20 million from 160 families. The families were guaranteed, in various literature and at seminars (or "Academies", as styled in the literature), returns of three to four percent *per month*. Trustees, after sending in their money, received receipts, but little else. Investors were apparently not given much information regarding the manner in which FGT employed their money. A number of people did receive some returns, but the whole thing came to a crashing halt in 1999.

In October 1999 investors received a letter from Mr. Prescott advising that payments would be suspended pending investigation of defalcations by Mr. Fritts. The precise problem is not described in any particular detail. Investors eventually were told that Fountainhead Global had invested a substantial portion of their funds in an entity called Cash for Titles. CFT was placed in the

---

[3] Only NTS trustees, that is, people who had paid the $9,500 to have trusts created, were eligible to invest through FGT. This assured an exclusive service for the investors, and a tested and proven market for FGT.

PAGE 4 - MEMORANDUM OPINION

hands of a receiver for liquidation in an action brought by the Securities and Exchange Commission. Investors were told that they should make claims against the receivership to get their money back. However, it does not appear that very many were able to do so. While the record is unclear, it seems likely that most of the investors' money is gone.[4]

Accusations flew between Mr. Prescott and Mr. Fritts, culminating in an action brought in the Circuit Court for Josephine County, Oregon, by Fritts against Prescott. Fritts eventually abandoned the case. If he has been heard from since, no mention of it has been made on this Court's record.

4. FGT and FES

As noted, FES was formed as a "charitable" trust, ostensibly to carry out eleemosynary activities for FGT before NTS. Its assets consisted largely of real property in Josephine County, Oregon, acquired by FGT and conveyed to FES. Presumably the money used by FGT to acquire the land came from investments from NST-minted trusts; however, the evidence on this point is sketchy. The trustees by this time were Mr. Prescott, Mr. Fritts, and Ivan Cermak. After Mr. Fritts' departure, Peter Thompson was appointed trustee. A letter from Ivan Cermak, as trustee of FES, to the "Board of Trustees" of FGT states the conditions of the acquisition of the largest parcel, known as the "Deer Creek Ranch":

---

[4] Other acquisitions by FGT included an Internet startup called Bigger.net, which failed, a huge cache of food being held somewhere in Utah, and the Oregon real estate eventually transferred to FES.

PAGE 5 - MEMORANDUM OPINION

>     1. FES will acquire and take title to the property for
>     a sum not exceeding three million dollars
>     ($3,000,000).
>     2.  FGT will provide the necessary funds for such
>     acquisition out of various funds under its control.
>     3.  FGT will retain the right to hypothecate
>     (mortgage) said property as suits FGT.  On such
>     occasion(s), FES shall pledge said property as
>     security for these FGT transactions, provided however
>     that FES will take on no financial obligations other
>     than the pledge of the property.
>     4.  FES agrees to manage the property as Fiduciary
>     [sic].
>     5.  FES will have full, unrestricted use of the
>     property, the intended use being the establishment of
>     an Education Center to suit its charitable purposes.
>     6.  Should financial conditions require FGT to sell
>     said property, FES shall, on thirty days' notice,
>     cooperate in such sale.  The proceeds of such sale
>     shall revert to FGT. [See Exhibit 8, page 39/91]

The trustees apparently had a falling out, and Messrs. Cermak and Thompson moved to expel Mr. Prescott as a trustee.  Prescott initiated litigation in Josephine County.  In a separate suit, FGT sued FES in the Circuit Court, claiming a right to have the title transferred by FES to FGT.  The Circuit Court found that FGT was entitled to summary judgment in its favor with respect Deer Creek Ranch. Specifically, the Court found that there were no genuine issues with respect to the following:

>     a.  The promissory note dated June 25, 1998...is
>     consistent with and supported by documentation in
>     evidence....
>     b.  The promissory note provides that, for value
>     received of $2.65 million, defendant Fiduciary
>     Education society ("FES") will "retitle" the property
>     at 1241 Illinois River Rd, escrow No. 98111802KJ, back
>     to plaintiff Fountainhead Global Trust ("FGT") and one
>     other organization upon the occurrence of specified
>     "events of default."  The escrow number referred to is
>     the transaction by which FGT and other organizations
>     transferred the sum of $2.65 million into escrow for
>     the purchase, in FES's name, of Deer Creek Ranch.

PAGE 6 - MEMORANDUM OPINION

      b. [sic] Deer Creek Ranch comprised seven separate parcels of land, which upon purchase were titled in the name of Ivan Cermak as trustee of Fiduciary Education Society.
      c. The money used to purchase the Deer Creek Ranch for FES was provided by Fountainhead Global Trust (FGT) and the other organizations controlled by plaintiff. None of the money used to purchase the Deer Creek Ranch was provided by FES.
      d. One of the events that constitute a default under the terms of the promissory note is "the application for appointment of a receiver" for FES. This event occurred when the litigation in Josephine County Circuit Court case no. 99CV0422 initiated by Roy Fritts resulted in FES's assets being placed into receivership.

      (Judgment of the Circuit Court for Josephone County, Oregon, Newman, J., in case No 02CV0522, filed May 20, 2004)

Judge Newman's decision was announced by letter on January 14, 2004. On January 20, 2004, before the Court had a chance to enter its judgment, FES filed for relief under Chapter 11 of the Bankruptcy Code. The petition was executed by Ivan Cermak as trustee. The largest claimants disclosed in the schedules were Mr. Cermak and Mr. Thompson, another trustee. No mention is made in the schedules of creditors of FGT or its investors.

FES removed the Josephine County litigation to this Court. FGT sought, and received, an order remanding the case to the Circuit Court. Three of FGT's investors then filed an involuntary petition against FGT, which was contested. At the hearing, it was determined that one of the petitioning creditors was ineligible, and that the petitioning creditors had failed to prove that a second petitioning creditor was qualified. The involuntary petition was dismissed.

PAGE 7 - MEMORANDUM OPINION

Given the confusion regarding the identity and authority of FES' trustees, the Court ordered parties to show cause why a trustee should not be appointed, or the case converted to one under Chapter 7. At the hearing, the debtor-in-possession waived any objection to appointment of a trustee, and the Court directed the United States Trustee to designate a Chapter 11 trustee. However, the UST was unable to find someone willing to serve in that capacity, and moved that the case be converted. It was so ordered, without objection from the Debtor.

The Trustee has now moved for an order substantively consolidating the existing case with the assets of FGT, NTS, and other entities.

## II. DISCUSSION

Substantive consolidation involves the aggregation of assets of the Debtor and other entities into a single pool. Claims against any of the entities are paid from the pool. In re Bonham, 229 F.3d 750, 764 (9th Cir. 2000). Substantive consolidation, particularly when opposed by an entity being brought in, is a purely equitable remedy, and one which should be allowed only in extraordinary situations. In re Lease-A-Fleet, Inc., 141 B.R. 869 (Bankr. E.D. Pa. 1992). Given the risk to the interest of creditors in forcing creditors of one debtor to share with creditors of a less solvent debtor, substantive consolidation is not to be seen as an instrument of procedural convenience, but rather something that goes directly to the substantive rights of the parties. In re Augie/Restivo Baking Co. Ltd., 860 F.2d 515, 518 (2nd Cir. 1988).

PAGE 8 - MEMORANDUM OPINION

Under Bonham, the party seeking substantive consolidation must demonstrate either that (1) creditors dealt with the entities to be combined as a single economic unit and did not rely on the separate credit of each of the separate entities, or (2) the operations of the entities were "excessively entangled" to the extent that consolidation would benefit all creditors. Bonham, 229 F.3d at 766; In re Central European Industrial Development Co. LLC, 288 B.R. 572, 576 (Bankr. N.D. Ca. 2003).

The sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors. In considering this point, courts have looked for a number of factors, including: whether the debtors were independent of each other; whether creditors dealt only with one debtor and lacked knowledge of its relationships with others; whether there were consolidated financial statements; the difficulty in segregating individual debtor's assets and liabilities; the existence of transfers of assets without observation of corporate formalities; and whether the affairs of the debtors are so entangled that consolidation would benefit all creditors. See Augie/Restivo, 860 F.2d at 518, and cases cited therein.

Finally, substantive consolidation is an extraordinary remedy with no basis in the statutory structure of the Bankruptcy Code. Given the extraordinary nature of the remedy, a party seeking substantive consolidation should demonstrate that the goals of consolidation cannot be met by other means.

Substantive consolidation is not appropriate in this case, for the following reasons:

1. <u>Consolidation would prejudice FES' creditors</u>.

The claims register reveals that several trade creditors have outstanding balances, and that two of them have been reduced to judgment. There are also a number of claims made by investors of Fountainhead Global. Nothing in the claims actually filed with the Court provides any evidence that FES is liable with FGT on the claims of FGT's investors. Substantive consolidation would have the effect of diluting the straight-forward claims of FES' trade creditors, to their prejudice. FGT's creditors have no claim against FES purely by virtue of the fact that FES' property was being held for FGT's benefit. Their claims should be made in a direct proceeding against FGT. (More on that below).

2. <u>Relationship of FGT and FES</u>.

The litigation in this court and in the Circuit Court in Josephine County reveal a struggle between two opposing camps for control of the debtor's assets. The agreement between the two entities made it clear that FES' rights to the Ranch property were limited. For all intents and purposes FES was no more than a caretaker, given the right to possess and use the property for purposes approved by FGT, and only so long as it suited FGT.

In this respect, this case is distinguishable from <u>Bonham</u> and similar cases. In <u>Bonham,</u> an individual running a ponzi scheme created many different entities to collect and hold funds collected from victims. She would dip into one or more of these entities as

PAGE 10 - MEMORANDUM OPINION

her needs required.  In other cases, the entities being consolidated had already been run as a single economic unit, or were used by a single person or group of people for their own benefit, without regard to corporate formalities.  The individual in control sought bankruptcy relief, and the court ordered consolidation of the subsidiary enterprises.

This case would be similar to <u>Bonham</u> if FGT had been the debtor, and the trustee sought to bring in assets of FES.  However, matters here are the other way around; the subordinate entity, acting through two of its three trustees, filed its own petition in an attempt to take control of assets to which the senior entity, FGT, had been found by a court to be entitled to recover.  The dubious purpose of the petition is highlighted by the fact that the schedules listed Cermak and Thompson has holding large claims, with no reference to the FGT investors.

Where the original petition is suspect, compounding the abuse of the bankruptcy system by application of the equitable doctrine of substantive consolidation is not appropriate, even in light of the fact of inequitable conduct by the entities sought to be absorbed.

3. <u>Procedural concerns</u>.

The remedy sought by the Trustee gives rise to significant procedural difficulties.  Specifically, it is not clear who would control the consolidated Debtor.  Unlike <u>Bonham</u> and similar cases, the entities to be consolidated here are controlled by two distinct and mutually hostile factions.  So long as the case is in Chapter 7 this might not be a problem.  However, it is not clear that the new

PAGE 11 - MEMORANDUM OPINION

consolidated debtor would not have the right to convert the case back to Chapter 11 in light of the fact that the bulk of the assets, claims, and ownership rights related to the consolidated estate were not involved at the time the case was converted from Chapter 11 to Chapter 7.

   4. <u>Availability of other remedies</u>.

There is nothing in the Bankruptcy Code which specifically authorizes substantive consolidation. The Court of Appeals has described the theory as "emanating from the core of bankruptcy jurisprudence," <u>Bonham</u>, 229 F.3d at 764. The rule is, ultimately, a judicial gloss based solely on the Bankruptcy Court's powers as a court of equity. <u>In re Augie/Restivo Baking Company, Ltd.</u>, 860 F.2d at 518. Exercise by a trial court of its equitable authority is a matter of discretion. <u>In re Munoz</u>, 287 B.R. 546, 552 (9th Cir. BAP 2002)(internal citations omitted).

For equitable relief to be available, it is generally required that no adequate legal remedy is available. <u>Continental Airlines, Inc. v. Intra Brokers, Inc.</u>, 24 F.3d 1099, 1104 (9th Cir. 1994), <u>Mort v. U.S.</u>, 86 F.3d 890, 892-93 (9th Cir. 1996).

The Trustee acts for FES's estate in bankruptcy, and stands in the shoes of its creditors. It is not entirely clear what the Trustee wishes to accomplish with substantive consolidation. If it is simply to recover the property lost in the Josephine County litigation, then substantive consolidation is clearly inappropriate. The matter was duly determined by a competent court in litigation that was substantially complete before the FES petition for relief

PAGE 12 - MEMORANDUM OPINION

was filed. It has been established that the subject property belongs to FGT, and not FES, and this court does not have authority to undo that determination. Substantive consolidation is not available as a tool to reel the property back in.

The tenor of the Trustee's trial memorandum and argument at trial suggests that he is also interested in ensuring some recovery for FGT's investors. The Trustee cannot be faulted for desiring this result[5]: however, there are a number of steps that the investors can take which are better suited to these circumstances. Assuming that grounds can be substantiated, remedies at law may include:

- actions under state law by investors to recover funds delivered to FGT;[6]
- actions under State or Federal Securities laws;
- an action in State Court to remove FGT's current trustees, or to dissolve the trust; or
- an involuntary bankruptcy of FGT or its principals.[7]

---

[5] A line of questioning from FGT's counsel, wisely not pursued in closing argument, suggests that the Trustee is motivated by a desire for a substantial commission. There is no evidence to support this implication, and no reason to believe that the Trustee is not performing in the manner expected of him by this Court. Moreover, any commission earned by a trustee in the case envisioned by the motion would be hard-earned indeed.

[6] That such claims may be subject to a limitation of actions defense is immaterial. Equity does not favor those who stand on their rights.

[7] As noted, the previous involuntary bankruptcy was dismissed
(continued...)

PAGE 13 - MEMORANDUM OPINION

To the extent the investors are creditors of FES, the trustee has the same remedies available to him. 11 U.S.C. § 544. If they are not, then the trustee has no cause to invoke the court's equitable powers to consolidate.

## III. CONCLUSION

The Trustee has not sustained his burden of proof that substantive consolidation is appropriate. While FGT's conduct, and the losses it has caused, are deplorable, its misconduct does not justify expansion of this case through substantive consolidation.

The foregoing constitutes the Court's findings of fact and conclusions of law. An order will be entered denying the Trustee's motion, and dissolving the restraining order imposed by the Court at the close of the hearing in this matter.

FRANK R. ALLEY, III
Bankruptcy Judge

cc: David Mills
    Keith Boyd
    Ron Sticka
    Gail Geiger

---

[7](...continued)
upon a finding that one or more of the petitioners was not qualified. This leaves roughly 158 families not bound by the decision.

PAGE 14 - MEMORANDUM OPINION